

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. PD-0823-14

### THE STATE OF TEXAS

**v.**

### JOHN BERRY JACKSON, Appellee

### ON STATE'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE ELEVENTH COURT OF APPEALS
### MITCHELL COUNTY

YEARY, J., delivered the opinion of the Court in which KELLER, P.J., and KEASLER, HERVEY, ALCALA, RICHARDSON and NEWELL, JJ., joined. HERVEY, J., filed a concurring opinion in which KEASLER, RICHARDSON, and NEWELL, JJ., joined. MEYERS, J., filed a dissenting opinion. JOHNSON, J., concurred in the result.

### O P I N I O N

Law enforcement officers, suspecting Appellee of drug trafficking, placed a global positioning system (GPS) tracking device on his car in an attempt to ascertain when and where he was obtaining his supply. They monitored his movement as he traveled at speeds exceeding the posted speed limit. They independently verified that he was speeding by

pacing his car in their own unmarked vehicles. Later, another officer who was aware of the narcotics investigation, verified by radar that Appellee was speeding and pulled him over for that traffic offense. Without ever issuing Appellee a speeding citation, the officers obtained his consent to search his car and discovered a quantity of methamphetamine in the trunk. A short time later Appellee confessed that it was his.

The State prosecuted Appellee for possessing methamphetamine with intent to deliver. Appellee moved to suppress both the methamphetamine and his confession. The trial court held that both were rendered inadmissible, pursuant to Article 38.23(a) of the Texas Code of Criminal Procedure, because the search was accomplished through the installation and monitoring of the GPS tracker. It granted Appellee's motion to suppress. TEX. CODE CRIM. PROC. art. 38.23(a).

Rejecting the State's argument that the independent verification of Appellee's speeding offense constituted an "intervening circumstance" that attenuated the taint of the illegal search, the Eleventh Court of Appeals affirmed the trial court's ruling. *State v. Jackson*, 435 S.W.3d 819, 827-31 (Tex. App.—Eastland 2014). We granted the State Prosecuting Attorney's ("SPA") petition for discretionary review to examine its contention that, in so holding, the court of appeals misapplied *State v. Mazuca*, 375 S.W.3d 294 (Tex. Crim. App. 2012). We will reverse.

## BACKGROUND

In late November of 2011, Billy Sides, an investigator with the 32nd Judicial District

Attorney's Office in Mitchell County, arranged for a confidential informant to make two controlled purchases of methamphetamine in Colorado City. Sides personally watched as Appellee delivered the contraband from a Dodge Charger. On the basis of that information and more, Sides sought a court order, pursuant to Article 18.21, Section 14, of the Texas Code of Criminal Procedure, authorizing him to install and monitor a mobile tracking device on the Charger. TEX. CODE CRIM. PROC. art. 18.21, § 14. The judge of the 32nd Judicial District signed such an order on December 2, 2011, and a GPS tracking device was installed on December 6th.[1] Sides had programmed the device to alert him on his cell phone if the Charger left Colorado City. On December 12, 2011, Sides received such an alert. He began to monitor the Charger via the GPS tracking device as it moved toward the Dallas/Fort Worth Metroplex, which Sides had been told was the source of Appellee's supply of methamphetamine. Eventually the Charger stopped for about two hours in a residential neighborhood in Mesquite, outside of Dallas. When the Charger began its return trip to Colorado City, Sides drove an unmarked vehicle to Taylor County, located the Charger, and began to follow it back to Mitchell County. At this point he was able to recognize that Appellee was driving the Charger.

---

[1] Such orders were authorized by statute upon a showing of "reasonable suspicion that . . . criminal activity has been, is, or will be committed[.]" TEX. CODE CRIM. PROC. art. 18.21, § 14(c)(5)(A). Sides's affidavit seeking the court order for installation and use of the mobile tracking device presented facts from which he averred that reasonable suspicion existed, but it did not purport to provide probable cause. The court order accordingly found no more than "reasonable suspicion to believe that the installation and utilization of a mobile tracking device . . . will produce evidence of a felony[.]"

Sides had already been able to tell from the GPS tracking device that Appellee was consistently traveling at three to four miles per hour over the posted speed limit.[2] He verified this information by pacing the Charger in his own vehicle. As they approached Mitchell County, Sides contacted Deputy Sheriff Gary Clark, who had also been involved in the narcotics investigation.[3] Sides asked Clark to pull Appellee over for speeding. Before doing so, Clark also verified, using radar, that Appellee was traveling three to four miles per hour over the posted speed limit.

Sides arrived at the scene of the traffic stop almost immediately. He heard Appellee orally grant Clark consent to search the Charger within a few minutes of the stop. A search of the trunk uncovered two ounces of methamphetamine. Appellee was immediately arrested and taken to the police station.[4] Admonished of his rights, Appellee readily admitted in a

---

[2] As the court of appeals noted, "[a]n officer who was unaware of the [narcotics] investigation stopped [Appellee] for speeding near Six Flags in Arlington." *Jackson*, 435 S.W.3d at 823. That officer cited Appellee but did not arrest him.

[3] Clark did not testify at the hearing on the motion to suppress, and Sides did not testify that Clark was involved in the narcotics investigation. But in Sides's application for installation of the mobile tracking device, which was sworn to and admitted into evidence at the suppression hearing, he indicated that Clark was involved in the controlled purchases of methamphetamine from Appellee.

[4] Sides testified that they did not linger long "in the field":

It wasn't very long. Long enough to just to find the dope. And then we brought the vehicle in. We had multiple officers there. I believe we brought his vehicle into the police department and took him into the interrogation room. I mean it was fast. We didn't dwell out on the highway at all.

Thus, it appears that both Appellee's consent to search the Charger and his confession that the methamphetamine was his came quite soon after the roadside stop.

recorded interview that he had consented to the search of the Charger and that he had purchased the methamphetamine "in Dallas" for resale.[5]

Appellee was indicted for possession of methamphetamine with intent to deliver in an amount weighing four grams or more but less than 200 grams, a first degree felony. TEX. HEALTH & SAFETY CODE §§ 481.102(7), 481.112(d). He filed a motion to suppress and the trial court held a hearing. After the hearing, the parties agreed to, and the trial court entered an order endorsing, the following written findings of fact:

1. An affidavit for the installation and use of a mobile tracking device pursuant to Article 18.21 § 14, Texas Code of Criminal Procedure, was presented to the 32nd District Court Judge on December 2, 2011.

2. The order authorizing the installation of a mobile tracking device was signed on December 2, 2011, and on December 6, 2011, an electronic tracking device was installed on the light blue 2006 Dodge Charger, bearing license plate BW1V825, being used by the Defendant, John Berry Jackson, Jr[.] in Mitchell County, Texas.

3. On December 12, 2011, law enforcement used the tracking device to track the Defendant's vehicle from Mitchell County, Texas, to Mesquite, Texas, and back again.

4. The Defendant's movements in the car were closely monitored by law enforcement, and very soon after crossing the line back into Mitchell County, the Defendant was stopped for speeding.

5. The Defendant gave verbal consent to law enforcement to search his vehicle.

6. The Defendant's car was searched, and when methamphetamines were found, the Defendant was arrested.

---

[5] Although we have highlighted the salient facts, we nevertheless recommend the court of appeals's exhaustive and well rendered recitation. *Jackson*, 435 S.W.3d at 822-24.

The agreed order also included a finding of fact (although it was designated a "conclusion of law") that "[a] warrant was not obtained by law enforcement prior to installation and use of the mobile tracking device on [Appellee's] vehicle."

The trial court granted Appellee's motion to suppress, concluding that the warrantless search here was unconstitutional. The trial court relied on *United States v. Jones*, 132 S.Ct. 945 (2012), in which the United States Supreme Court declared that the physical intrusion necessary to install such a tracking device, taken together with the subsequent monitoring of the vehicle using that device, constituted a "search" for Fourth Amendment purposes. The trial court rejected the State's argument that any taint from the illegal use of the GPS tracking device was attenuated by the officers' verification that Appellee was speeding before they pulled him over.[6] Accordingly, the trial court suppressed "all information gathered by law enforcement, including statements of the Defendant, from the time law enforcement installed the mobile tracking device[.]"[7] The State appealed. TEX. CODE CRIM. PROC. art. 44.01(a)(5).

---

[6] The prosecutor argued:

> The intervening circumstances where the testimony that you addressed yourself, Your Honor, you stated that there was a radar indication that he was speeding. In addition, Mr. Jackson, Jr., stated later in his interrogation that he was speeding, and so he doesn't deny that that occurred. The entire time they were following him, there's what's called pacing, and the vehicle was pacing his speeds. So, there were plenty of indications that he was violating the law, which is all that's required for a traffic stop.

[7] In adopting the parties' agreed conclusions of law, the trial court reasoned that, "[a]side from the information gathered from the mobile tracking device, law enforcement would not have known where the Defendant was, would not have had reason to intercept the Defendant's vehicle, and *therefore did not have probable cause to search the Defendant's vehicle*." (Emphasis added.) It might have been more germane to conclude that, without the information provided by the GPS device, law enforcement would not have been in a position independently to observe and stop

The court of appeals affirmed. *Jackson*, 435 S.W.3d at 831. It agreed with the trial court that the State's use of the GPS tracking device constituted an illegal search, concluding that it violated the Fourth Amendment for two reasons: 1) it occurred in the absence of a warrant, and 2) it was based upon a finding of reasonable suspicion rather than probable cause. *Id*. at 826.[8] The court of appeals next rejected the State's argument that the officers' independent verification of Appellee's speeding offense and Appellee's consent to the search constituted intervening circumstances for purposes of an attenuation-of-taint analysis. *Id*. at 829-30.[9] Instead, the court of appeals determined that there were no intervening circumstances between the illegal search and the obtaining of the contraband and confession—or at least no circumstances that were not themselves a product of the primary

---

Appellee for speeding, thus providing a legitimate opportunity to seek his consent to search the Charger (since, with consent, the officers did not *need* probable cause), which in turn led to his arrest and confession. This was essentially what the court of appeals later held in affirming the trial court's ruling. *See Jackson*, 435 S.W.3d at 829 ("Deputy Clark's stop of Jackson for speeding was closely connected to the officers' use of the GPS device. The planned stop stemmed from data gathered by the use of the GPS device; it did not result from a wholly separate observation by Deputy Clark.") (internal quotation marks omitted).

[8] In its petition for discretionary review, the SPA does not now contest that the search involving the GPS tracking device was conducted without a warrant and in the absence of a magistrate's determination of probable cause.

[9] Not every Fourth Amendment violation results in the suppression of evidence. *Mazuca*, 375 S.W.3d at 300. Evidence is not subject to the exclusionary rule simply because the police would not have discovered it "but for" the Fourth Amendment violation. *Id*. The question is whether the evidence was obtained "by exploitation of" the Fourth Amendment violation "or instead by means sufficiently distinguishable to be purged of the primary taint." *Id*. (quoting *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963)). Factors to be considered in determining whether evidence must be suppressed include "[t]he temporal proximity of the arrest and [obtaining of the evidence], the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct[.]" *Id*. at 302 (quoting *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975)).

illegality. *See id*. at 829, 830. Finding no intervening circumstances, and following this Court's lead in *State v. Mazuca*, 375 S.W.3d at 306-07, the court of appeals relied heavily on the temporal proximity factor of the *Brown v. Illinois*[10] attenuation-of-taint analysis to "conclude that the discovery of the methamphetamine and [Appellee's] statements to the officers were not sufficiently attenuated from the illegal GPS search to purge the taint of the illegality." *Jackson*, 435 S.W.3d at 830-31.

The SPA now challenges the court of appeals's heavy emphasis on the temporal proximity factor. The SPA argues that the court of appeals erred to conclude that the officers' verification of Appellee's speeding infraction did not constitute an intervening circumstance.[11] Because there was an intervening circumstance, the SPA maintains, the court of appeals should have focused more on the third attenuation-of-taint factor, namely, whether the conduct of the officers was purposeful or in flagrant disregard of the law. The court of appeals acknowledged that the officers believed the GPS monitoring was lawful at the time and that "[t]he officers did not intend to conduct an illegal search." *Id*. at 830. The SPA argues that, consistent with the approach we announced in *Mazuca*, this Court should now rely on the third factor, which, the court of appeals conceded, "weighs in favor of the State[,]" *id*., to hold that the taint of the illegal GPS tracking device was sufficiently

_____

[10] 422 U.S. at 603-04.

[11] The SPA does not expressly argue that the court of appeals also erred to hold that Appellee's consent was not an intervening circumstance. We therefore limit our review to whether the court of appeals erred to hold that the verification of Appellee's speeding did not constitute a sufficient intervening circumstance to attenuate taint.

attenuated that the contraband and confession should both have been admitted. We granted the petition for discretionary review in order to address these contentions. TEX. R. APP. P. 66.3(c).

**ANALYSIS**

In *Jones*, the Supreme Court held that "the Government's installation of a GPS device on a target's vehicle, and its use of the device to monitor the vehicle's movements, constitute[d] a 'search.'" 132 S.Ct. at 949. The Court emphasized that neither the intrusion involved in the initial installation of the GPS tracking device nor the subsequent monitoring of the vehicle's movements could alone constitute a Fourth Amendment search; it was the combination of the trespass "conjoined with . . . what was present here: an attempt to find something or to obtain information." *Id*. at 951, n.5.

Consistent with *Jones*, it appears here that the installation of the GPS tracking device and its subsequent employment to monitor Appellee's whereabouts constituted a search for Fourth Amendment purposes. The SPA does not presently contest that this search was illegal. Without the tracking device, the officers in this case would not have been alerted to the fact that Appellee had left Mitchell County or that he was speeding. They would also not have known to put themselves in a position to verify his unlawful speeding as a justification for pulling him over. In the strictest sense, then, Appellee's detention and his attendant consent to search, the discovery of the contraband, and Appellee's admission of ownership, were all but/for products of the primary illegality, which was the warrantless installation of, and

subsequent monitoring of Appellee with, the GPS tracking device.

But neither the Fourth Amendment exclusionary rule nor our own statutory exclusionary rule, embodied in Article 38.23(a) of the Code of Criminal Procedure, requires the suppression of evidence that was not "obtained" as a result of some illegality. *Johnson v. State*, 871 S.W.2d 744, 750-51 (Tex. Crim. App. 1994); *State v. Daugherty*, 931 S.W.2d 268, 270 (Tex. Crim. App. 1996); TEX. CODE CRIM. PROC. art. 38.23(a). Moreover, not every but/for product of police illegality will constitute evidence "obtained" from that illegality for either federal or state exclusionary rule purposes; evidence is not subject to suppression, in other words, "simply because it would not have come to light but for the illegal actions of the police." *Mazuca*, 375 S.W.3d at 300 (quoting *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963)). Instead, as we said in *Mazuca*,

> the more apt question is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.

*Id*. (internal citations and quotation marks omitted). In this case, the question boils down to whether the verification by police of Appellee's speeding through "pacing" and radar constituted a "means" of obtaining the contraband that was "sufficiently distinguishable" from the illegal installation and monitoring with the GPS device "to be purged of the primary taint." *Id*.

In *Brown v. Illinois*, 422 U.S. 590 (1975), the Supreme Court addressed the factors involved in determining whether a confession should have been suppressed as the product

of an illegal arrest. The Court rejected the notion that preliminary Fifth Amendment warnings and the apparently voluntary nature of the confession could, by themselves, serve to attenuate the taint of the primary illegality. *Id*. at 601-03. The Court declared that "[t]he temporal proximity of the arrest and confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct" all must be considered. *Id*. at 603-04. This Court has long applied these three *Brown v. Illinois* factors for determining attenuation of taint, both for purpose of the Fourth Amendment exclusionary rule (as we must) and also for the purpose of our own statutory exclusionary rule, provided for in Article 38.23(a) of the Code of Criminal Procedure. *See Johnson*, 871 S.W.2d at 750-51, and cases cited therein; TEX. CODE CRIM. PROC. art. 38.23(a).

*Mazuca* did not involve a confession; we therefore had no cause to inquire whether *Miranda* warnings were administered or whether Mazuca had voluntarily spoken to the police.[12] The question in *Mazuca* was, rather, how to apply the remaining *Brown* factors in a case involving an illegal detention followed immediately by the discovery of an outstanding arrest warrant and the seizure of evidence in the course of a search of Mazuca's person pursuant to an execution of that warrant. We declined to hold that the discovery of the arrest warrant could serve categorically to attenuate the taint of the illegal initial detention that led to the discovery of that warrant. 375 S.W.3d at 306. Such a holding, we observed, would overemphasize the intervening-circumstance factor "to the ultimate detriment to the goal of

---

[12] 375 S.W.3d at 302; *Miranda v. Arizona*, 384 U.S. 436 (1966).

deterrence that animates the exclusionary rule." *Id*. Instead, we held, the presence or absence

of such an intervening circumstance dictates which of the two remaining *Brown* factors

should carry greater significance. *Id*. We summarized:

> When police find and seize physical evidence shortly after an illegal stop, in the absence of the discovery of an outstanding arrest warrant in between, that physical evidence should ordinarily be suppressed, even if the police misconduct is not highly purposeful or flagrantly abusive of Fourth Amendment rights. Under this scenario, temporal proximity is the paramount factor. But when an outstanding arrest warrant *is* discovered between the illegal stop and the seizure of physical evidence, the importance of the temporal proximity factor decreases. Under this scenario, the intervening circumstance is a necessary but never, by itself, wholly determinative factor in the attenuation calculation, and the purposefulness and/or flagrancy of the police misconduct, *vel non*, becomes of vital importance.

*Id*. at 306-07.[13]

---

[13] It almost goes without saying that when police officers unlawfully detain an individual and only then discover an outstanding arrest warrant, they may—indeed, they should—arrest him pursuant to that warrant. Nothing about the fact of the illegal detention that led to the discovery of the outstanding warrant should adversely impact the State's ability to prosecute the individual for the prior offense that gave rise to that warrant. But, any evidence that comes to light only as a result of that illegal detention, and that is relevant to an offense *other* than the prior offense for which the arrest warrant issued, will unquestionably be subject to suppression under the exclusionary rule of the Fourth Amendment and Article 38.23 of the Code of Criminal Procedure—unless, of course, the taint of the illegal detention is attenuated as judged by application of the *Brown v. Illinois* factors. *See, e.g.*, *State v. Moralez*, 300 P.3d 1090, 1100 (Kan. 2013) ("[A]n arrest made pursuant to an outstanding warrant is not invalidated by a prior unlawful detention."); *State v. Bailey*, 338 P.3d 702, 712 (Ore. 2014) ("Where a person's identity is made known to the police during an unlawful detention, and he or she is determined to be the subject of a valid arrest warrant, the police may lawfully arrest the person and conduct a lawful search incident to the arrest. However, the *Brown* framework nevertheless applies to the separate determination whether the causal connection between the unlawful detention and the discovery of evidence in the search incident to arrest has been sufficiently attenuated so as to dissipate the taint of the illegality."). Whether evidence recovered following *both* the initial illegal detention and the discovery of the arrest warrant may *also* be subject to suppression in the prosecution of the offense for which the arrest warrant issued is an open question that we need not address today.

Of course, the primary illegality in the instant case was not, as in *Mazuca*, Appellee's initial roadside detention. Here, the primary illegality was the on-going search via the GPS tracking device that enabled the police to make the observations they relied upon to justify Appellee's initial roadside detention. Did the officers' independent verification of Appellee's speeding constitute an intervening circumstance? If so, this would trigger *Mazuca*'s emphasis on the third *Brown* factor, the purposefulness and flagrancy of official misconduct, which weighs heavily in favor of attenuation. Or was the officers' verification of Appellee's speeding (even as the search was on-going) *itself* the tainted product of the primary illegality? In that event, the court of appeals properly focused on the first *Brown* factor, temporal proximity. Emphasis on the temporal proximity factor favors the conclusion that Appellee's roadside consent to search and his subsequent station-house admission were indeed "obtained" by exploitation of the illegal GPS tracking device.

We agree with the SPA that the independent verification of Appellee's speeding in this case was just as much of an "intervening circumstance" as was the discovery of the valid arrest warrant in *Mazuca*. It is true that, in this case, the primary illegality—the illegal installation and monitoring of the GPS tracking device—was still taking place at the time the officers verified Appellee's speeding. But the illegal detention that was the primary illegality in *Mazuca* did not wholly occur at a discrete point in time either. While it was certainly *initiated* at a discrete point in time, the illegal roadside detention in *Mazuca* was *also* still underway—and still illegal—at the later point in time at which the detaining officers

discovered the valid arrest warrant. And yet, we still regarded that discovery as an "intervening circumstance." *Mazuca*, 375 S.W.3d at 309. So long as the "circumstance" "intervenes" between the *inception* of the primary illegality and the later discovery of evidence that is alleged to be "fruit of the poisonous tree," we hold that a reviewing court may appropriately regard it as an "intervening circumstance" factor in the attenuation-of-taint analysis.[14]

Moreover, the SPA is correct that, given such an intervening circumstance, *Mazuca* dictates that a reviewing court should emphasize the third *Brown* factor, which asks whether the police purposefully and flagrantly disregarded Appellee's Fourth Amendment rights. 375 S.W.3d at 306-07. The court of appeals conceded that there was no flagrant police misconduct. *Jackson*, 435 S.W.3d at 830. We agree. At the time Investigator Sides obtained the court order to install the GPS tracking device on Appellee's car, the Supreme Court had not yet declared that the installation and monitoring of such a device constitutes a search for Fourth Amendment purposes. A Texas statute expressly permitted peace officers to install

---

[14] Indeed, in *Brown* itself, the Supreme Court regarded the administration of *Miranda* warnings as a kind of relevant (albeit never, by itself, dispositive) intervening circumstance even though the illegal seizure that led up to Brown's confession (a warrantless arrest made without probable cause) was still underway at that time. *Brown*, 422 U.S. at 591-96. "[T]he Miranda warnings, *alone* and per se, cannot always make the act [of confession to the police] sufficiently a product of free will to break, for Fourth Amendment purposes, the causal connection between the illegality and the confession. They cannot assure in every case that the Fourth Amendment violation has not been unduly exploited. * * * The Miranda warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered." *Id*. at 603. Thus, the Supreme Court treated the giving of *Miranda* warnings as an event occurring after the inception of the primary illegality and before obtaining a confession that might help establish that the confession was not, for Fourth Amendment purposes, the product of that primary illegality.

and use such devices upon sworn application to a district judge providing reasonable suspicion of criminal activity for which the device will likely produce material information. TEX. CODE CRIM. PROC. art. 18.21, § 14(a) & (c). Sides executed a sworn application pursuant to this statutory provision that met all of the qualifications for the issuance of a court order, and the judge of the 32nd Judicial District Court issued it. Nothing in the record suggests that Sides had any inkling, before *Jones*, that adhering to the statutory scheme would not suffice to render installation and use of the GPS tracking device in all things legal. He had no particular reason to believe or suspect that the statutory criteria of "reasonable suspicion" would prove to be (because a "search" for Fourth Amendment purposes ordinarily requires more) constitutionally deficient. Thus, the primary illegality in this case was not the product of a flagrant disregard of Appellee's constitutional rights. There was no evidence Sides harbored any such intent.

It is undeniable that Sides's use of the GPS tracking device was "purposeful," in the sense that he expressly hoped to obtain evidence in his narcotics investigation against Appellee. But he did not knowingly violate Appellee's constitutional rights in that pursuit. He also perpetrated no *further* constitutional violation in conducting his investigation.[15] Thus, Sides's purposefulness in stopping Appellee for speeding did nothing to exacerbate the initial—inadvertent—constitutional breach. Law enforcement officers conducting the same

---

[15] Even if Sides instigated Appellee's traffic stop on a pretext, hoping to obtain consent to search the car, such a pretext stop is not *itself* unconstitutional so long as there is an objective basis in the record to support it. *Arkansas v. Sullivan*, 532 U.S. 769 (2001); *Whren v. United States*, 517 U.S. 806 (1996); *Crittenden v. State*, 899 S.W.2d 668 (Tex. Crim. App. 1995).

narcotics investigation in the absence of an illegal GPS tracking device would have been entitled to follow Appellee's car for as long as it took to observe him commit a traffic offense and conduct a similar stop. The parties have agreed and the record supports the proposition that, once Appellee was stopped, he voluntarily consented and confessed. Neither the consent nor the confession was the result of any incremental illegality beyond the non-flagrant primary illegality of installing and monitoring the GPS tracking device in the absence of a warrant obtained on the basis of probable cause. Simply put, Sides never operated beyond the bounds of what he reasonably believed to be perfectly acceptable, even routine, police conduct.

## CONCLUSION

Both the second and third *Brown* factors favor the conclusion that the taint of the unconstitutional GPS tracking device search had dissipated by the time Appellee consented to the search of his vehicle and confessed that the methamphetamine discovered therein were his. We reverse the judgment of the court of appeals and remand the cause to the trial court for further proceedings consistent with this opinion. *Mazuca*, 375 S.W.3d at 310.


DELIVERED:     July 1, 2015
PUBLISH